106 So.2d 831 (1958)
Sheldon W. WILSON, Plaintiff-Appellant,
v.
Earl SAWYER, Defendant-Appellee.
No. 8846.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1958.
Rehearing Denied November 25, 1958.
Writ of Certiorari Denied December 15, 1958.
Goff & Caskey, Arcadia, for appellant.
Love & Rigby, Shreveport, for appellee.
AYRES, Judge.
Plaintiff seeks to recover of defendant $1,400, with 8% per annum interest thereon, from January 1, 1951, until paid, together with 10% additional on principal and interest as attorney's fees, less a credit of $200 paid January 20, 1953. This claim *832 is predicated upon two promissory notes, each for the sum of $700, executed and signed by defendant January 1, 1951, and payable to plaintiff, the first January 1, 1953, and the second January 1, 1954.
The defense is that the notes represent the balance of a gambling debt due by defendant to plaintiff as the result of a loss sustained by defendant in a dice game about a year or more prior to the execution of the notes, and that, as such, the object of the transaction was unlawful and contrary to public policy and good morals. On trial, this defense was sustained, and from the judgment rendered, plaintiff appealed.
The jurisprudence is well settled in this State that the courts will not entertain actions to recover what has been either won or lost in gambling. Sampson v. Whitney, 27 La.Ann. 294; Bagneris v. Smoot, 159 La. 1049, 106 So. 561; Nielsen v. Planters Trust & Savings Bank of Opelousas, 183 La. 645, 164 So. 613; Stewart Bros. v. Beeson, 177 La. 543, 148 So. 703; Russo v. Mula, La.App., 49 So. 2d 622. Accordingly, no action will be maintained on a check given in payment of gambling losses. Russo v. Mula, supra; Friel v. Murchison, 8 La.App. 354. Neither will the courts entertain demands for collection of notes given for gambling debts. Whitesides v. McGrath, 15 La.Ann. 401; Bagneris v. Smoot, supra; Keen v. Butterworth, La.App., 185 So. 37.
The statutory basis for this line of jurisprudence is found in the provisions of the Louisiana Constitution of 1921, LSA, Art. 19, § 8, which, so far as pertinent, provides:
"Gambling is a vice and the Legislature shall pass laws to suppress it,"
and in the provisions of the LSA-Civil Code. For instance, LSA-C.C. Art. 2983 provides, in part:
"The law grants no action for the payment of what has been won at gaming or by a bet * * *."
Moreover, all contracts which have as their object that which is forbidden by law or contrary to good morals are void. LSA-C.C. Art. 1892. By the "cause" of a contract is meant the motive or consideration for making it. LSA-C.C. Art. 1896.
"An obligation without a cause, or with a false or unlawful cause, can have no effect." LSA-C.C. Art. 1893.
"The cause is unlawful, when it is forbidden by law, when it is contra bonos mores (contrary to moral conduct) or to public order." LSA-C.C. Art. 1895.
Thus, it is well settled that the courts will not entertain demands for the collection of notes or other obligations which have been given for a gambling debt or for a cause or consideration which is unlawful or contrary to public order or morals. Bagneris v. Smoot, supra; Martin v. Seabaugh, 128 La. 442, 54 So. 935; Bank of New Orleans v. Frantom, 22 La. Ann. 462.
In the light of the aforesaid constitutional and statutory rules and the jurisprudence of this State, the decisive question is whether the notes sued upon represent gambling losses of defendant to plaintiff. This, of course, presents a factual issue. Important, however, to its determination is a legal question as to the burden of proof, which question should be resolved prior to a discussion of the facts.
The law presumes that men in their business transactions do not intend to violate the law or to make contracts, the enforcement of which the law refuses a remedy. Therefore, where a party asserts a contract is illegal, he has the burden to establish that defense or contention. Conner & Hare v. Robertson, 37 La.Ann. 814, 55 Am.Rep. 521; Baucum & Kimball v. Garrett Mercantile Co., 188 La. 728, 178 So. 256; Stewart Bros. v. Beeson, supra.
*833 Therefore, a legal presumption exists, in effect, in favor of the validity of contracts. The law does not assume an intention on the part of the contracting parties to violate its provisions nor will their agreement be decreed illegal where a reasonable construction supports its validity. J. P. Barnett Co. v. Ludeau, 171 La. 21, 129 So. 655. Moreover, to sustain a defense of the illegality of a contract, the illegality must be clearly shown. Tuckermann v. Jackson, 3 Orl.App. 399; Carlton v. Rice, 5 Orl.App. 19. It may be appropriate here to observe that the defense to the recovery on the notes is strictly not a want or failure of consideration but that the contract or notes themselves are illegal by virtue of their execution and delivery to pay a gambling obligation of defendant to plaintiff.
A consideration of the evidence is now in order. A brief résumé thereof will suffice. The documentary evidence consists of the two notes to which defendant admitted executing and signing. Only three witnesses testified, plaintiff and his wife on his behalf, and only the defendant in his behalf. The evidence establishes that plaintiff and defendant had known each other for several years. Defendant was engaged in an oil tool business in Bossier Parish, in which he was one of the two larger stockholders. Plaintiff was engaged in a mercantile and filling station business, in connection with which he loaned money and financed automobiles and other personal property. His business was located at Ringgold, Louisiana.
During the period of their acquaintance both parties readily admitted they engaged in social gambling, in which the amounts wagered, won and lost were not inconsiderable and ranged as high as $3,000. The outcome of their entertainment was not one-sided. Fortunes and misfortunes were visited upon both indiscriminately, and, at times, each was frequently a loser and, on occasions, one or the other became "busted", whereupon the loser would borrow from the other. The faithfulness and honesty with which these obligations were kept between them engendered a degree of confidence, one in the other.
As to the particular transaction, plaintiff insists that he made a bona fide loan of $1,400 to the defendant; that it was upon the insistence of the defendant, who related circumstances of adversity, such as that, at the time, his was a struggling business, that his father was ill in the hospital and that a member of his family experienced difficulties which necessitated his acquisition of a loan. Plaintiff says that defendant came to his place of business in Ringgold two or three times and discussed with him the matter of a loan; that after having given the matter consideration and deciding to make the loan, he and his wife drove to Bossier City and to defendant's place of business; that plaintiff went in said place, following which plaintiff and defendant came out, crossed the street to the Kickapoo Cafe, where they occupied a booth and drank coffee. Defendant prepared and signed the two notes and delivered them to plaintiff, who thereupon delivered or paid over to defendant in cash the $1,400. On leaving the cafe plaintiff delivered the notes for safe keeping to his wife to be placed in their safe at their residence.
Defendant testified that he never made any trip to Ringgold to borrow money; that he did not borrow the money, as plaintiff asserts, but that he gave the notes in settlement of a gambling loss of $3,000 which he had sustained a year or more prior to that time and which he had reduced, by payments, to $1,400. This the plaintiff denies and says that defendant did not owe him any gambling obligation at the time the notes were executed and signed. The defendant, moreover, contends that the reason he did not pay this debt was because the game was "crooked". This explanation, however, is unconvincing in that, if it be true, he would have paid $1,600 prior to the execution of the notes and then, more than two years thereafter, $200 on the notes. His belated actions apparently are afterthoughts. Defendant's lack of recollection as to important facts and circumstances surrounding *834 the game in which he claims to have lost substantially only adds to the unconvincing character of his story. Too, he named three or four others who were supposedly present and engaged in the game, most, if not all, of whom, were residents of either Bossier City or Bossier Parish, yet none of them were produced as witnesses.
The trial court was of the opinion, that, on account of defendant's business, there was no need for him to borrow $1,400 of plaintiff. In this connection, the evidence discloses that it was only some four or five years prior to the trial in February of 1958 that defendant's business had prospered; in fact, defendant testified that his was a struggling concern at the time the notes were executed and that, although plaintiff had insisted upon his payment of the notes and made demands therefor, he was really without available funds for that purpose. Defendant was of the opinion plaintiff was unaware of his financial circumstances at the time.
Mrs. Wilson, in her testimony, corroborated her husband. Remaining in the car while plaintiff and defendant were in the cafe, she did not actually see the delivery of the money. However, the notes were delivered to her when her husband returned to the car.
Plaintiff contends that the defendant has not borne the burden of proof of his special defense of the illegality of the transaction. Our review of the entire record convinces us of the correctness of plaintiff's position. The record could not, with any degree of certainty, be said to preponderate in defendant's favor, nor does it cast a reasonable doubt as to the legality of the notes sued upon. The conclusions reached by the trial court to the contrary constitute, in our opinion, manifest error.
Accordingly, for the reasons assigned, the judgment appealed is annulled, avoided, reversed and set aside, and it is now ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Sheldon W. Wilson, against the defendant, Earl Sawyer, for the full sum of $1,400, with 8% per annum interest thereon from January 1, 1951, until paid, together with 10% additional on both principal and interest as attorney's fees, and for all costs of this suit, including the cost of this appeal, less a credit of $200 paid January 20, 1953.
Reversed and rendered.

On Rehearing
PER CURIAM.
In presenting an application for rehearing, defendant-appellee complains this Court committed error, inter alia, in the allowance of interest from the date of the notes. Appellee's obligation was the payment of the principal of the notes "with interest at the rate of eight (8) per cent. per annum, after ...... until paid * * *." Therefore, that the notes do not recite any date from which interest is payable is obvious from a mere inspection of the notes themselves.
However, the contention is without merit. The Negotiable Instruments Law, Act 64, Sec. 17 of 1904 (LSA-R.S. 7:17) states:
"Where the language of the instrument is ambiguous, or there are omissions therein, the following rules of construction apply: * * *
"(2) Where the instrument provides for the payment of interest, without specifying the date from which interest is to run, the interest runs from the date of the instrument, and if the instrument is undated, from the issue thereof." (Emphasis supplied.)
For these reasons, recovery of interest was properly allowed.
The motion for rehearing is, therefore, denied.